**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | § | |
|---|---|---|
| | § | CASE NO: 20-11624 |
| IN RE: | § | |
| | § | CHAPTER 13 |
| LORRAINE ROBINSON, | § | |
| | § | SECTION A |
| | § | |

| | § | |
|---|---|---|
| LORRAINE ROBINSON AND JOHNNIE ROBINSON, | § | |
| | § | |
| | § | |
| | § | ADV. NO. 23-1011 |
| PLAINTIFFS, | § | |
| | § | |
| V. | § | |
| | § | |
| JONATHAN BURDEN, | § | |
| ZERO THREE FOUR INVESTMENT | § | |
| GROUP, and | § | |
| DAVID ALFORTISH, | § | |
| | § | |
| DEFENDANTS. | § | |

**MEMORANDUM OPINION AND ORDER**

By way of background and to understand the posture of the matters currently before the Court, the Court refers the reader to this Court's *Memorandum Opinion and Order* dated September 21, 2023, entered in the adversary proceeding, in which the Court made the following findings of fact:

> On or around December 2016, Lorrain Robinson ("Lorraine" or the "Debtor") suffered a stroke, leaving her partially disabled. Her brother, Johnnie, cared for her, looking after her physical wellbeing in addition to helping her manage her financial affairs. In doing so, Johnnie helped Lorrain manage a rental property located at 3426-3428 (or 3426 ½ or 3428 ½) South Liberty Street, New Orleans, LA 70115 (the "Property"), which provided Lorraine's primary source of income. On June 16, 2020, Johnnie obtained power of attorney over Lorraine. A few months later, he assisted her in filing the present bankruptcy case on September 20, 2020 to save the Property. Throughout the bankruptcy case, Johnnie took care of Lorraine, managed the Property, and made payments to the Trustee on her behalf.

1

In January 2023, Lorraine passed away.  Johnnie assumed responsibility for the bankruptcy case and continues to make payments to the Trustee.

On or about February 1, 2023, [Jonathan] Burden appeared at the Property and asserted to Johnnie that he owned it.  Burden told Johnnie that Lorraine signed a quit claim deed conveying the Property to Burden.  Prior to this interaction, Johnnie had never seen or heard of Burden.

On March 5, 2023, Burden came to the Property a second time.  This time the police were called.  When the police arrived, Burden showed the police a quitclaim deed.  Johnnie told both the police and Burden about the pending bankruptcy case.  But after reviewing Burden's quitclaim deed and records on the Parish Tax Assessor's Web site, the police told Johnnie that he had to leave the Property.  The police also told Johnnie that if he came back to the Property, he would be arrested.  Afterward, Burden used social media to mock Johnnie and brag about taking Lorraine's house.

Burden also initiated eviction actions against tenants.  At least one of the tenants paid Burden rent because they were unsure who owned the Property and were afraid of being evicted.  Burden has not returned any of the rents collected to Johnnie.  Johnnie was unable to collect rents from the tenants or fill the vacant units for at least three months.

The Property consists of six units:  four apartments and two small rooms. Before Lorraine passed away, she lived in one apartment and tenants rented the other three apartments.  The two small rooms were vacant. When Lorraine passed away, her apartment became available.  Prior to Burden's interference, Johnnie rented three units to tenants for $450, $500, and $600 per month. . . .

On May 17, 2023, Debtor's counsel, Jonathan DeTrinis, initiated an adversary proceeding on behalf of Lorraine's estate and Johnnie as the representative of her bankruptcy estate against Burden, Burden's closely held company, and attorney David Alfortish, seeking a declaration that the quitclaim deed is null, enforcement of the automatic stay, disgorgement and return of estate property, and an award of attorneys' fees and sanctions for violations of the automatic stay and Louisiana state law.  In retaliation, on June 2, 2023, Burden filed in Louisiana state court a Petition for Protection from Stalking or Sexual Assault against DeTrinis.  DeTrinis was forced to respond to that petition and, ultimately, the case was dismissed for lack of prosecution.

[Adv. No. 23-1011, ECF Doc. 26] (internal citations and footnotes omitted).  Based upon the

evidence presented at hearings held on June 9, 2023, and June 23, 2023, the Court entered Orders

(i) finding that the automatic stay applied to the Property and rents emanating from the Property

and that Burden had willfully violated the automatic stay; (ii) enjoining Burden from possessing

or controlling the Property and rents; and (iii) assessing sanctions against Burden for willful violations of the automatic stay.  [Adv. No. 23-1011, ECF Docs. 15, 20 & 26].

At this time, the remaining claims alleged in the Complaint are claims seeking (a) to rescind, terminate, annul, and render void the Quitclaim Deed and Purchase Contract purportedly entered into by Lorraine and Burden on December 19, 2019 (Count 1); and (b) sanctions under the Louisiana Unfair Trade Practices and Consumer Protection Law (Count 3).[1]

On November 22, 2024, this Court held a one-day trial in the adversary proceeding.  The Court heard testimony from Burden, Alfortish, and Johnnie.  All parties stipulated to the admission of the following exhibits as evidence:  Robinson Exhibits 1–2, 4–11, 13–16, 18–19, 21 and Joint Exhibits 1–6.  [Adv. No. 23-1011, ECF Doc. 234].  During the trial, the Court also admitted Robinson Exhibit 12 into evidence.  *Id.*

Pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, the Court now makes the following findings of fact and conclusions of law and concludes that the Quitclaim Deed and the Purchase Contract purportedly executed between Jonathan Burden and Lorraine Robinson are relative nullities under Louisiana law.  Alternatively, the Court finds the entire transaction between Burden and Lorraine for the sale of the Property to be a simulation and thus an absolute nullity under Louisiana Law.[2]

---

[1]     Count 2 seeking enforcement of the automatic stay against the Defendants was granted pursuant to earlier Orders entered by the Court.  [Adv. No. 23-1011, ECF Docs. 15, 20 & 26].  Count 3 requests sanctions and damages under the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPCA").  [ECF Doc. 1].  LUTPCA provides that "[a]ny person who suffers any ascertainable loss of money or movable property . . . may bring an action individually but not in a representative capacity to recover actual damages."  LA. REV. STAT. ANN. § 51:1409(A).  Johnnie does not have the authority to pursue LUTPCA claims in a representative capacity on behalf of Lorraine or her bankruptcy estate.  Thus, Count 3 is denied.

[2]     To the extent that any of the following findings of fact are determined to be conclusions of law, they are adopted and shall be construed and deemed conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted and shall be construed and deemed as findings of fact.

## JURISDICTION AND VENUE

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334.  The matter presently before the Court constitutes a core proceeding that this Court may hear and determine on a final basis under 28 U.S.C. § 157(b)(2)(B).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## FINDINGS OF FACT

### Specific Witness Credibility Determinations

1.      The Court finds Burden to be an unsophisticated—yet opportunistic—businessman and does not find Burden to be a credible witness.   Burden has no formal education or training in real estate finance, and his testimony reflected only cursory knowledge regarding real estate transactions in Louisiana.  The Court finds Burden to be an evasive and argumentative witness and gives little to no weight to his testimony.

2.      Alfortish, a licensed Louisiana attorney, participated in the trial *pro se*.  As a witness, the Court finds Alfortish to be pleasant, but not credible as to specific events concerning the alleged notarization and execution of the Quitclaim Deed.   The Court's credibility determination regarding Alfortish is influenced by Alfortish's testimony regarding a documented ethical violation against him as a public notary in the state of Louisiana for failing to verify the identity of a party to a real estate transaction that Alfortish notarized.  Thus, the Court gives little to no weight to his testimony.

3.      The Court finds Johnnie to be a generally credible and earnest witness.  He appeared to answer questions posed to him truthfully and to the best of his recollection.  The Court finds Johnnie's testimony to be helpful and credible as to his sister's health, habits, and finances, but his

testimony specifically as to the alleged notarization and execution of the Quitclaim Deed was of limited use due to his lack of direct involvement with the transaction.

### Lorraine and Johnnie Robinson

4.      On June 24, 2005, Lorraine purchased the Property.  Her bankruptcy Schedules filed in September 2020 list the Property's value at $225,000, with first- and second-position consensual mortgages encumbering the Property in the approximate total amount of $193,000. [No. 20-11624, ECF Docs. 4 & 6].   The plan of reorganization confirmed by this Court contemplated payment of prepetition mortgage arrearages in the principal amount of $19,593.71. [No. 20-11624, ECF Docs. 48 & 51].

5.      Johnnie is Lorraine's younger brother.  *See* Hr'g Rec'g 2:24–:34 (Nov. 22, 2024). Johnnie testified that he and Lorraine enjoyed a "pretty good relationship" until 2005.  *See id.* Around that time, their niece died in a car accident and Hurricane Katrina severely impacted southeastern Louisiana.  *See id.*  Thereafter, the siblings grew apart.  *See id.*

6.      In 2016, Lorraine suffered a severe stroke.  *See id.*  The stroke left her unconscious for an extended period of time, and the doctors treating Lorraine were unsure whether she would recover.  *See id.*  Lorraine stayed in the hospital for three or four months, and, although she eventually regained consciousness, she never fully recovered.  *See id.*  Her ability to walk and speak were permanently affected by her stroke.  *See id.*

7.      Johnnie returned to Lorraine's life during that time to care for her.  *See id.* Following her release from the hospital, Johnnie moved Lorraine into his home to assist with her recovery.  *See id.*  Nurses and physical therapists provided treatment and personal care to Lorraine weekly in Johnnie's home and Johnnie also transported Lorraine to doctors' visits and physical

therapy outside the home for months. *See id.* Despite all of the months of therapy, Lorraine required crutches or a walker to navigate on her own after her stroke. *See id.*

8.      Lorraine lived with Johnnie for approximately eight or nine months. *See id.* She eventually decided to live at her Property because Johnnie would not allow her to smoke inside his house. *See id.* Johnnie testified that he did not believe she was ready to live on her own again, but she insisted. *See id.* Shortly after returning home, Lorraine fell and fractured her hip. *See id.* Following surgery on her hip, Lorraine lived with Johnnie in his home for a few more months. *See id.* That injury and subsequent procedures further worsened her ability to both walk and speak. *See id.*

9.      Both the stroke and the fall, as well as the months of rigorous and intensive medical care, also negatively affected Lorraine's mental capacity. *See id.* Johnnie testified that Lorraine started acting "crazy" and "wild" while recovering from her stroke, which required the hospital to install cameras and restrain her at times. *Id.*; *see also* Hr'g Rec'g 3:15–:20. She never fully recovered. *See* Hr'g Rec'g 2:24–:34; 3:15–:20. According to Johnnie, "her mind just wasn't the same" and "she wasn't as sharp." Hr'g Rec'g 2:24–:34. Johnnie blamed her declining mental capacity as the reason for her default on her mortgage obligations in 2019. *See id.* Although she previously managed her own finances, Lorraine was unable to continue doing so after her stroke and hip surgery, and eventually, Johnnie had no choice but to obtain power of attorney to manage her finances and care. *See id.*; Joint Ex. 6.

**Jonathan Burden, Zero Three Four Investment Group, and David Alfortish**

10.      Burden is the sole member-manager of Zero Three Four Investment Group, a Louisiana-based limited liability company. *See* Robinson Ex. 19. Burden is or has been the sole member-manager of several other limited liability companies, all of which are organized in the

state of Louisiana and he operates those businesses from his mother's home on Peniston Street in New Orleans. *See id.* Through those entities, Burden engages in "real estate investing" in Louisiana, South Carolina, and Florida. *See* Hr'g Rec'g 9:46–:48; 9:53–10:01.

11.     Burden testified that he helps struggling homeowners by executing "purchase and sale [agreements], putting deals together, and buying non-performing mortgages." Hr'g Rec'g 9:53–10:01. He testified that he finds struggling homeowners through a variety of sources including "from the real estate itself [or from] foreclosures when a property is heading to an auction, . . . [and] tax sales." Hr'g Rec'g 9:46–:48. He also testified that he does door-to-door sales and, occasionally, gets referrals. *See id.* Burden explained that, after meeting with a potential client, he will structure a deal based on the nature of the client's financial condition because "each deal has its own DNA to it, so they are all different." Hr'g Rec'g 9:53–10:01. He testified that, although the specifics of each deal vary, he generally opts to buy the non-performing mortgage from the lender at a discount. *See id.* That strategy, Burden testified, allows him to structure a workout with his client because "[he is] the bank at that time, so it stops the property from going to the auction because its [his] loan at that particular point." *Id.* He explained that a "workout" may involve a buy-out, a loan modification, executing a deed in lieu of foreclosure, or selling the mortgage to another lending institution. *See id.* In other cases, Burden testified that he may execute an act of sale with his clients. *See id.*

12.     Alfortish has been a licensed attorney and a public notary in the state of Louisiana since 1975. *See* Hr'g Rec'g 12:46–1:07. Alfortish testified that he has regularly notarized documents throughout his professional career, and he estimates that he notarized approximately thirty documents in 2019. *See id.* In 2015, Alfortish was the subject of an investigation by the Office of Disciplinary Counsel into allegations that he "improperly notarized an act of sale of real

estate, causing actual harm." *In re Alfortish*, 164 So.3d 816 (La. 2015); *see also* Hr'g Rec'g 12:46–1:07. Alfortish admitted that he failed to verify the identity of the witness to the transaction he notarized and the person lied about who he purported to be. *See* Hr'g Rec'g 12:46–1:07. Alfortish remained an active public notary after his suspension and supervised probation. *See id.*

13. Alfortish and Burden had worked together on several transactions prior to the transaction giving rise to this adversary proceeding. *See id.* Alfortish had notarized several documents in transactions involving Burden. *See id.* The parties would meet at cafes or properties subject to the transactions to notarize documents. *See id.*

### Initial Meeting Between Burden and Lorraine on December 19, 2019

14. Lorraine struggled to make her monthly mortgage payments for the Property after she returned home. *See* Robinson Ex. 11. Her mortgage statement dated July 15, 2019, indicates that Lorraine was 256 days delinquent on her mortgage. *See id.* Lorraine's total delinquency at that time was $7,267.90 for February 2019 through July 2019 mortgage payments. *See id.* The total outstanding balance on the mortgage as of July 15, 2019, was $115,004.50. *See id.* Lorraine's financial situation had not improved by December 2019.

15. Because Lorraine is deceased, the Court only has Burden's testimony on the subject of how the two met. Burden testified that, by December 2019, Lorraine had met him on a few occasions and had become familiar with the work that he does. *See* Hr'g Rec'g 9:48–:53; 12:14–:16. Burden stated that he "has roots in the neighborhood" and regularly visited the area to see family and do business. Hr'g Rec'g 9:48–:53; 12:14–:16. Burden's mother lives nearby, and his mother-in-law used to live across the street from the Property. *See* Hr'g Rec'g 9:48–:53; 12:14–:16. Burden testified that he "was also known in the neighborhood for his work." Hr'g Rec'g 9:48–:53; 12:14–:16. He testified that he had worked on several properties nearby and, in

December 2019, was actively working on another property that he owned on the same street as Lorraine.  *See* Hr'g Rec'g 9:48–:53; 12:14–:16.

16.    On December 19, 2019, Burden testified that Lorraine sent someone to find him and invite him to her home; when he arrived, Burden testified that Lorraine explained to him the hardship she was experiencing regarding her mortgage and the Property.  *See* Hr'g Rec'g 9:48–:53; 12:14–:16.  Burden contends that Lorraine complained that the mortgage lender would not accept her $1,400 monthly installment payments because she was approximately $9,500 behind on her mortgage payments.  *See* Hr'g Rec'g 9:48–:53; 12:14–:16.  Burden testified that Lorraine requested Burden's assistance, and he agreed to help.  *See* Hr'g Rec'g 9:48–:53; 12:14–:16. Burden then said he left Lorraine's house with plans to return that evening to finalize their deal. *See* Hr'g Rec'g 9:48–:53; 12:14–:16.

### Follow-Up Meeting Between Burden and Lorraine

17.    Burden returned to Lorraine's house around 11:00 p.m. on December 19, 2019.  *See* Hr'g Rec'g 10:06–11:09.  He brought with him at least $7,500 in cash,[3] a document entitled "Purchase Contract" (Joint Ex. 4), and a document entitled "Quitclaim Deed" (Joint Ex. 2).  *See* Hr'g Rec'g 10:06–11:09; Robinson Exs. 9 & 10.  Lorraine was the only other person in the Property at this time, and she remained seated in her chair for the duration of the meeting.  *See* Hr'g Rec'g 10:06–11:09; Robinson Exs. 9 & 10.

18.    Burden testified that he explained to Lorraine that the mortgage lender would only accept the full arrearage payment of $9,500 and thus would keep returning to her any $1,400

---

[3]    After his initial meeting with Lorraine, Burden went to his bank and withdrew $7,500 cash.  *See* Hr'g Rec'g 11:55–12:04; Robinson Ex. 13.  He had already withdrawn $1,200 on December 18.  *See* Hr'g Rec'g 11:55–12:04; Robinson Ex. 13.  Burden testified that he brought "a little bit more than $7,500" with him to his follow-up meeting with Lorraine.  Hr'g Rec'g 10:51–:53; 11:55–12:04.

payments. *See* Robinson Ex. 5. He testified that, because Lorraine did not have sufficient funds to pay the full arrearage, he offered to cure the $9,500 arrearage in exchange for Lorraine's interest in the Property subject to the existing mortgage. *See* Hr'g Rec'g 10:06–11:09. Burden testified that he offered to grant Lorraine a usufruct so that she could continue living in the Property. *See* Hr'g Rec'g 10:06–11:09; 12:17–:28. Burden testified that the deal required that Lorraine remain responsible for all monthly mortgage payments as they came due while she lived in the Property. *See* Hr'g Rec'g 10:06–11:09; 12:17–:28.

19.    Using his cell phone, Burden recorded himself telling Lorraine that once they completed the deal documents—the Purchase Contract and the Quitclaim Deed—he would pay the mortgage company the full amount of the arrears. *See* Robinson Ex. 4. During that conversation, Burden showed Lorraine the cash he had brought with him to "show[] her my proof of funds so that I can perform." Hr'g Rec'g 10:06–11:09; Robinson Ex. 4. Burden testified that "the property [was] being purchased subject to the existing mortgage in place [and] subject to transactions are paid over time." Hr'g Rec'g 10:06–11:09. Burden further testified that he then paid Lorraine $1.00 as a deposit. *See id.* He testified that "I'm letting her know that once we do the documents because that's part of the protocol, we gotta have a deal first, we gotta have something on paper. Purchase and sales agreement and we get the deed done," then he would "pay her." *Id.*

20.    Burden and Lorraine then began filling out the Purchase Contract and the Quitclaim Deed together. *See id.* Using his cell phone, Burden recorded Lorraine filling out portions of both documents pursuant to his instructions. *See id.* Neither video shows Lorraine signing the documents. *See* Robinson Exs. 9 & 10.

21.     The terms of the Purchase Contract do not reflect the deal that Burden testified that he made with Lorraine.  The Purchase Contract purports to sell the Property to Zero Three Four Investment Group.  *See* Joint Ex. 4.  The purchase price for the Property is listed on the Purchase Contract as the "Loan Balance + Fees."  *Id.*  Although Burden testified that "Loan Balance + Fees" meant only $9,500 in mortgage arrears, *see* Hr'g Rec'g 10:06–11:09; 12:17–:28, the Court finds that the plain, unambiguous language of the Purchase Contract defines "Loan Balance + Fees" as the balance of all encumbrances on the Property.  *See Harp v. Succession of Bryan*, 313 So. 3d 284, 293 (La. 2020) ("If the words of the contract are clear, unambiguous, and lead to no absurd consequences, the court need not look beyond the contract language to determine the parties' true intent.").  The Purchase Contract provided for a "cash deposit in the amount of $1.00 shall apply as part" of the purchase price of "Loan Balance + Fees," with "[t]he remaining balance of Loan Balance + Fees - $1.00 will be paid at closing."  Joint Ex. 4.  The Purchase Contract also provided that "[t]his contract shall close on or before 7,300 business days following the execution of the agreement . . . at Gulf South Title Company."  *Id.*

22.     Burden and Lorraine then began filling out the Quitclaim Deed.  *See* Joint Ex. 2.  Although Lorraine had purportedly sold the Property to Zero Three Four Investment Group only moments before, Burden listed himself individually as the grantee of the Property.  *See* Hr'g Rec'g 10:06–11:09; 12:17–:28.  Using his cell phone, Burden recorded Lorraine filling out the section for her name as the grantor and a portion of the section for the Property description.  *See* Robinson Ex. 10.  Burden also indicated to Lorraine that he would fill out the date and the remaining sections for the Property description later.  *See id.*  Burden testified that the second page of the Quitclaim Deed containing the signature blocks was left blank because it required a notary.  *See* Hr'g Rec'g

10:06–11:09. Burden testified that he and Lorraine agreed to meet with Alfortish at a later date and time to notarize the Quitclaim Deed. *See* Hr'g Rec'g 10:06–11:09.

23. Burden stated that he left the Property around 11:30 p.m. *See* Hr'g Rec'g 11:32–:37. Upon returning home, Burden immediately assigned Zero Three Four Investment Group's interest in the Property to himself individually. *See id.*; Joint Ex. 5. The assignment is dated December 19, 2019. *See* Joint Ex. 5. But the assignment contains redactions for the amount of consideration paid by Burden to Zero Three Four Investment Group, as well as the expiration date of the assignment. *See id.*

**Lorraine and Burden Meet with Alfortish**

24. Burden and Alfortish both testified that Lorraine executed the Quitclaim Deed on December 22, 2019. But their versions of all other events surrounding the alleged execution and notarization of the Quitclaim Deed conflict.

*Burden's Version of the Notarization*

25. According to Burden, Lorraine, Alfortish, and he planned to meet at 4:00 p.m. at Alfortish's house at 2815 Kabel Drive in Algiers Point, Louisiana, which lies across the Mississippi River from New Orleans. *See* Hr'g Rec'g 11:09–:24; 12:30–:35. Burden testified that he picked Lorraine up at the Property and drove her to Alfortish's house. *See* Hr'g Rec'g 11:09–:24; 12:30–:35. The two arrived at Alfortish's house around 3:56 p.m. according to an audio file Burden allegedly recorded of himself helping Lorraine out of his vehicle at Alfortish's house. *See* Robinson Ex. 6.

26. Burden testified that he called Alfortish on his cell phone when he arrived, and Alfortish came out of the house to greet them. *See* Hr'g Rec'g 11:09–:24; 12:30–:35. Burden explained that, because no one else was at Alfortish's house at the time, he and Alfortish asked

12

two strangers that happened to be walking past Alfortish's house to serve as witnesses for the notarization of the Quitclaim Deed. *See* Hr'g Rec'g 11:09–:24; 12:30–:35. Burden could not recall how long the parties stood outside waiting for potential witnesses to walk by. *See* Hr'g Rec'g 11:09–:24; 12:30–:35. Thereafter, Burden testified that Lorraine and he executed the Quitclaim Deed, the strangers signed the Quitclaim Deed as witnesses, and Alfortish notarized the Quitclaim Deed. *See* Hr'g Rec'g 11:09–:24; 12:30–:35; Joint Ex. 2. Burden testified that he did not pay Lorraine any of the purchase price at that time. *See* Hr'g Rec'g 11:09–:24. He said he then drove Lorraine back to the Property. *See* Hr'g Rec'g 11:09–:24; 12:30–:35.

27.     As to Burden's version of events, Alfortish testified that Burden had only been to his house once to retrieve a package for an unrelated matter; Alfortish stated that he never notarized any documents for Burden at his own residence in Algiers Point. *See* Hr'g Rec'g 12:46–1:07. Burden attempted to corroborate his story with an audio recording timestamped December 22, 2019, at 3:56 p.m. which purports to demonstrate Burden driving Lorraine to Alfortish's house to notarize the Quitclaim Deed. *See* Robinson Ex. 6. Although the recording appears to have been taken inside of a vehicle, most of the audio is muffled. The only audible voice is that of Burden. Lorraine does not speak at all, and thus, there is no evidence that Lorraine was present when the recording was taken.

*Alfortish's Version of the Notarization*

28.     According to Alfortish, the execution of the Quitclaim Deed and his notarization occurred at the Property. *See* Hr'g Rec'g 12:46–1:07. Alfortish testified that he was working on a property located on the same block as the Property during the afternoon of December 22, 2019, when he received a call from Burden asking if he could notarize the Quitclaim Deed. *See id.* Alfortish stated that he grabbed his notary stamp, which he kept in his car, and walked over to the

Property.  *See id.*  When he arrived, he met two strangers standing outside of the Property who claimed to be the witnesses for the notarization.  *See id.*  Alfortish did not know either individual and did not verify any identification for either individual.  *See id.*  Alfortish could not recall the names or even the most basic description of the witnesses during his testimony.  *See id.*

29.     Alfortish testified that he and the two strangers entered the Property where they met Lorraine and Burden.  *See id.*  Lorraine remained bedridden for the duration of their meeting.  *See id.*  Alfortish did not check Lorraine's identification though he said she purported to be Lorraine and the owner of the Property.  *See id.*

30.     Alfortish testified that he understood the legal effect of the Quitclaim Deed, but that he did not read the document closely.  *See id.*  He testified that he did not explain to Lorraine the legal ramifications of signing the Quitclaim Deed, and he never asked whether she understood the effect of the document that she was being asked to sign.  *See id.*  Alfortish did not ask Lorraine why her signature was "Lorragne" as opposed to "Lorraine."  *See id.*

31.     Lastly, he testified that he never witnessed any exchange of money between Burden and Lorraine.  *See id.*  He stated that he merely walked inside the Property, notarized the Quitclaim Deed, and left.  *See id.*  After leaving, Alfortish did not file the notarized Quitclaim Deed into the public record.  *See id.*[4]  At some point, Alfortish testified that Burden compensated him for notarizing the Quitclaim Deed.  *See id.*

---

[4]     Under Louisiana law, "[n]otaries public shall record all acts of sale, exchange, donation, and mortgage of immovable property passed before them, together with all resolutions, powers of attorney, and other documents annexed to or made part of the acts, in their proper order, and after first making a careful record of the acts in record books to be kept for that purpose . . . ."  LA. STAT. ANN. § 35:199.

**Payment of the Sale Price**

32.     By the time the parties met with Alfortish, Burden had only paid Lorraine $1.00 deposit toward the sale price.  Burden testified that he paid Lorraine cash after the parties notarized the Quitclaim Deed.  *See* Hr'g Rec'g 10:18–:20; 11:21–:21; 11:55–12:04; 12:35–:40.  After driving Lorraine back to the Property and helping her inside, Burden alleges that he gave Lorraine several thousand dollars in cash toward the remaining balance of the sale price.  *See* Hr'g Rec'g 10:18–:20; 11:21–:21; 11:55–12:04; 12:35–:40.  Initially, Burden testified that he gave her $9,499.  *See* Hr'g Rec'g 10:18–:20; 11:21–:21; 11:55–12:04; 12:35–:40.  But later he testified that he was "unsure" whether he possessed the full amount $9,499 in cash with him on December 22, or whether he had to return with additional funds.  *See* Hr'g Rec'g 10:18–:20; 11:21–:21; 11:55–12:04; 12:35–:40.  His bank statement indicates that he withdrew $1,200 on December 23, 2019.  *See* Robinson Ex. 13.  He testified that he returned to Lorraine's house on either December 23 or 24, 2019, and paid Lorraine up to $9,499 in cash "plus a little extra for the holidays."  *See* Hr'g Rec'g 10:18–:20; 11:21–:21; 11:55–12:04; 12:35–:40.

33.     Lorraine never deposited $9,500 into her bank account.  *See* Robinson Ex. 12.  From December 19, 2019, through June 2020, Lorraine deposited only $1,980 into her account.  *See id.*[5]  Lorraine never paid the mortgage arrears due and continued to fall behind on her monthly mortgage payments.

34.     Burden never made any payments on mortgage arrears or monthly installment payments to the mortgage lender directly or to Lorraine.  *See* Hr'g Rec'g 10:18–:20; 11:21–:21; 11:55–12:04; 12:35–:40.

---

[5]     Lorraine deposited funds in cash or via check deposits.  Lorraine received several other deposits for Social Security, IRS tax refunds, and shopping returns during this time as well.

35.     Lorraine used her debit card to withdraw cash at an ATM on four separate occasions during the week after she allegedly received $9,500 in cash.  *See* Robinson Ex. 12.  Lorraine occasionally gave her card to family or friends to buy items from the store for her.  *See* Hr'g Rec'g 2:55–:58.  Lorraine or a friend of Lorraine used Lorraine's debit card to make the following withdrawals through the end of December 2019:  (i) $42.99 on December 24, 2019; (ii) $22.99 on December 26, 2019; (iii) $22.99 on December 27, 2019; and (iv) $42.99 on December 30, 2019.  *See* Robinson Ex. 12.  Lorraine regularly used her debit card to withdraw cash throughout the first half of 2020 as well.  *See id.*

36.     Other than $1.00, the Court finds that Burden never paid any funds to Lorraine for the sale of the Property.

**Burden "Misplaces" the Quitclaim Deed, the Purchase Contract, and the Assignment**

37.     After finalizing the deal with Lorraine, Burden testified that he did not record the Quitclaim Deed, the Purchase Contract, and the Assignment of the Property from Zero Three Four Investment Group to himself in the public record contemporaneously with the notarization of the Quitclaim Deed because he had "misplaced" them.  *See* Hr'g Rec'g 10:14–:18; 10:29–:32; 11:24–:55; 12:35–:37.  He testified that, immediately after the transaction with Lorraine, he placed all of those documents "on the last page of a legal pad" that he had used for business.  Hr'g Rec'g 10:14–:18; 10:29–:32; 11:24–:55; 12:35–:37.

38.     Burden testified that he "found" the Quitclaim Deed, the Purchase Contract, and the Assignment around the time he learned of Lorraine's deteriorating health and eventual death in early 2023.  *See* Hr'g Rec'g 10:14–:18; 10:29–:32; 11:24–:55; 12:35–:37.

16

**Lorraine's Grant of Power of Attorney and the Bankruptcy Filing**

39.     During the first six months of 2020, Johnnie continued to help Lorraine, and he remained active in her financial affairs and medical treatment.  *See* Hr'g Rec'g 2:24–:43.  But Lorraine's health continued to deteriorate during that time, and Johnnie learned that Lorraine was not paying her mortgage after observing the numerous notices sent by the mortgage company to Lorraine.  *See id.*  Thus, Johnnie testified, he felt he had no choice but to take a more active role in managing her financial affairs and medical treatment.  *See* Hr'g Rec'g 2:24–:43.

40.     On June 16, 2020, Johnnie obtained power of attorney over Lorraine's affairs.  *Id.*; Joint Ex. 6.  Both Johnnie and Gerald Wasserman, the attorney and notary who executed the power of attorney, explained to Lorraine the legal effect of executing the document.  *See* Hr'g Rec'g 2:24–:43; 3:23–:25.  Lorraine consented and signed the power of attorney.  *See* Hr'g Rec'g 2:24–:43; 3:23–:25; Joint Ex. 6.[6]

41.     Johnnie learned the full extent of Lorraine's financial struggles once he obtained power of attorney.  *See* Hr'g Rec'g 2:34–:43.  Not only was Lorraine approximately $19,000 in arrears on her mortgage obligations, but she also owed the New Orleans Sewerage and Water Board approximately $29,000.  See *id.*  Lorraine had also granted a second mortgage on the Property.  *See* Hr'g Rec'g 2:34–:43.  Later in June 2020, Johnnie received a Notice of Foreclosure on the Property; the foreclosure sale was scheduled for September 2020.  *See id.*  Johnnie was unsure how to handle the foreclosure, and he was eventually referred to Jonathan DeTrinis as potential bankruptcy counsel.  *See id.*  After meeting with counsel, Johnnie agreed to authorize the

---

[6]     At some point, although the record does not reflect when, Lorraine revoked Johnnie's power of attorney for her medical treatment after Johnnie became concerned that he was unable to fully attend to Lorraine's medical needs.  *See* Hr'g Rec'g 3:03–:06.  The power of attorney was transferred to Theron Edwards who, along with his wife, had been taking care of Lorraine.  *See id.*  Edwards and his wife took over the medical decisions for Lorraine, but Johnnie continued to manage her financial affairs.  *See id.*

filing of a chapter 13 bankruptcy on behalf of Lorraine to stop the foreclosure sale and attempt to reorganize her debts. *See id.*

42.     Johnnie filed the bankruptcy petition on September 16, 2020. [No. 20-11624, ECF Doc. 1]; *see also* Hr'g Rec'g 2:34–:43. He reviewed all of Lorraine's bank statements and prepared all of the documents that were included with the petition. *See id.* Upon filing, Johnnie remained active in the prosecution of the case. *See id.* He continued to review Lorraine's bank statements, collect rent from her tenants, and make her chapter 13 plan payments. *See id.*

43.     Despite overseeing Lorraine's affairs and preparing all of her financial statements, Johnnie never learned about the Purchase Contract and Quitclaim Deed between Lorraine and Burden. *See* Hr'g Rec'g 2:46–3:03; 3:11–:12; 3:25–:27. Lorraine never mentioned to him any meeting with Burden or any details of their transaction. *See* Hr'g Rec'g 2:54–3:03. Johnnie never found $9,500 in case at the Property or any copies of the Purchase Contract or Quitclaim Deed. *See id.*

44.     Johnnie had on occasion attempted to persuade Lorraine to sell the Property and relocate to a nursing home for better medical care. *See id; see also* Hr'g Rec'g 3:11–:12. But he testified that Lorraine insisted on living at the Property, and so he never contemplated that she would sell the Property without telling him. *See* Hr'g Rec'g 2:54–3:03; 3:11–:12.

**Burden Files the Documents After Lorraine's Death**

45.     Lorraine died on January 18, 2023, as a result of her deteriorating health. *See* Robinson Ex. 2; Hr'g Rec'g 2:43–:46.[7] As of that date, Burden had yet to record of the Quitclaim

---

[7]     Lorraine's death certificate listed the following causes of death: "failure to thrive (18 months), cerebrovascular accident (2 years), left hip fracture (2 years), age related osteoporosis (22 months), diabetes type 2, nicotine dependence, post stroke hemiplegia, and coronary artery disease." Robinson Ex. 2; Hr'g Rec'g 2:43–:46.

Deed, the Purchase Contract, or the Assignment of the Property from Zero Three Four Investment Property to himself into the public record. Burden testified that he learned of Lorraine's death shortly after as word in the neighborhood spread—which reminded him of their 2019 transaction. *See* Hr'g Rec'g 10:07–:18; 10:29–:32; 11:24–:55; 12:35–:37. He stated that he immediately began looking for the "misplaced" documents. *See* Hr'g Rec'g 10:07–:18; 10:29–:32; 11:24–:55; 12:35–:37. Burden testified that he could not recall exactly when he found the documents or how long after he found them that he decided to file them into the public record. *See* Hr'g Rec'g 10:07–:18; 10:29–:32; 11:24–:55; 12:35–:37.

46.     On January 24, 2023, Burden filed a copy of the Quitclaim Deed into the public records. *See* Joint Ex. 2. Burden testified that an attorney with whom he was working at that time advised him that the Quitclaim Deed would be effective against third parties once it was filed into the record. *See* Hr'g Rec'g 10:07–:18; 10:29–:32; 11:24–:55; 12:35–:37.

47.     On February 10, 2023, Burden filed redacted copies of the Purchase Contract as well as the Assignment into the public records. *See* Joint Exs. 3 & 5. Burden testified that he could not recall when he redacted the documents, but that he redacted the documents after he left Lorraine's house on December 19, 2019. *See* Hr'g Rec'g 10:07–:18; 10:29–:32; 11:24–:55; 12:35–:37. Burden redacted the purchase price, deposit amount, and the closing date from the Purchase Contract, and he redacted the sale price and expiration date on the Assignment. *See* Joint Exs. 3 & 5.

### CONCLUSIONS OF LAW

In May 2023, after encountering Burden at the Property, [Adv. No. 23-1011, ECF Doc. 26], Johnnie filed the Complaint in the above-captioned adversary proceeding. At this point, the remaining claim is a request for a declaration that the Purchase Contract and Quitclaim Deed are

null and void based on (i) fraud, (ii) duress, (iii) misrepresentations, (iv) lack of capacity, (v) error, (vi) elder abuse, (vii) improper form, (viii) lack of consideration, (ix) exploitation, (x) lesion beyond moiety, and (xi) violations of the bankruptcy automatic stay (Count 1).

For the following reasons, the Court grants Count 1. The Court concludes that the Purchase Contract and the Quitclaim Deed are relative nullities and that those nullities cannot be cured. Alternatively, the Court concludes that the transaction between Burden and Lorraine for the sale of the Property is a simulation and thus an absolute nullity under Louisiana law.

**A. The Purchase Contract Is a Relative Nullity and that Nullity Cannot Be Cured.**

A "[s]ale is a contract whereby a person transfers ownership of a thing to another for a price in money. The thing, the price, and the consent of the parties are requirements for the perfection of a sale." LA. CIV. CODE ANN. art. 2439. Under Louisiana law, four elements are required to form a valid contract: (1) capacity to contract; (2) mutual consent freely given; (3) a valid object; and (4) a lawful cause. *Granger v. Christus Health Cent. La.*, 144 So.3d 736, 760–61 (La. 2013); *see also* LA. CIV. CODE ANN. arts. 1918, 1927, 1966, & 1971. The parties must also fix the price in a sum certain or determinable through an agreed method, but "[t]he price must not be out of all proportion with the value of the thing sold." LA. CIV. CODE ANN. art. 2464.

Louisiana law further requires that "[a] transfer of immovable property must be made by authentic act or by act under private signature." *Fairbanks Dev., LLC v. Johnson*, 330 So. 3d 183, 186 (La. 2021) (citing LA. CIV. CODE ANN. arts. 1839 & 2440). "An authentic act is a writing executed before a notary public or other officer authorized to perform that function, in the presence of two witnesses, and signed by each party who executed it, by each witness, and by each notary public before whom it was executed." LA. CIV. CODE ANN. art. 1833. The Purchase Contract was not notarized and there is no dispute that the Purchase Contract is not in the form of an authentic

act. But "an act that fails to be an authentic act due to ta defect of form may still be valid as an act under private signature." *Harp v. Succession of Bryan*, 313 So. 3d 284, 294 (La. 2020).

"An act under private signature is executed by the parties themselves without the intervention of a public officer such as a notary public." *Id*. (citing *Rainey v. Entergy Gulf States, Inc.*, 35 So. 3d 215, 225 (La. 2010)). "A party against whom an act under private signature is asserted must acknowledge his signature or deny that it is his." *Id*. "A signature can be proven in open court, in the same manner as any other material and relevant circumstance." *Id*. The Purchase Contract came to light and was recorded by Burden in the public records after Lorraine's death. The evidence before the Court reveals that Burden chose to make video recordings of Lorraine's actions at various times on the night of December 19, 2019; however, none of the videos shows Lorraine signing the document and she is not here to acknowledge or deny her signature as is required under Louisiana law to give effect to the Purchase Contract. Thus, the Court finds that the Purchase Contract is a relative nullity and that nullity cannot be cured. *See, e.g., id*. at 294–96; *Turnley v. Turnley*, No. 2020-0849, 2021 WL 6331573 (La. App. 1 Cir. Dec. 30, 2021).

**B.      The Quitclaim Deed Is Not in the Form of an Authentic Act and, Like the Purchase Contract, Is a Relative Nullity Which Nullity Cannot Be Cured.**

*1.    The Quitclaim Deed was not properly witnessed and notarized and does not constitute an authentic act.*

The execution of the Quitclaim Deed by Lorraine and Burden was purportedly witnessed and notarized by Alfortish in the presence of two witnesses. The evidence shows otherwise.

As stated above, Louisiana law defines an authentic act as "a writing executed before a notary public or other officer authorized to perform that function, in the presence of two witnesses, and signed by each party who executed it, by each witness, and by each notary public before whom it was executed." LA. CIV. CODE ANN. art. 1833(A). Each contracting party, each witness, and

each notary must sign the authentic act. *See* LA. CIV. CODE ANN. art. 1833(B). The contracting parties must execute the writing before a notary public or other officer authorized to perform that function and in the presence of two witnesses. *See id*; *see also Arceneaux v. Arceneaux*, 364 So. 3d 529, 545 (La. App. 1 Cir. 2023), *writ denied*, 369 So. 3d 1271 (La. 2023). Any material deviation from the requirements governing authentic acts is fatal. *See Hardin v. Williams*, 468 So.2d 1302, 1304 (La. App. 1st Cir. 1985), *aff'd*, 478 So.2d 1214 (La. 1985).

"The purpose of the authentic act requirements is to ensure the validity of a signature on a document and that the person whose name appears on a document is the person who actually signed the document." *Arceneaux*, 364 So. 3d at 546. An authentic act "is presumed to be valid and is clothed with a presumption of genuineness." *Succession of Robin*, 286 So. 3d 396, 404 (La. 2019) (internal citations omitted). Thus, a party "seeking to invalidate an apparently authentic act must present strong and convincing proof of such magnitude as to overcome the presumption of verity of notarial acts." *Eschete v. Eschete*, 142 So.3d 985, 987 (La. App 1 Cir. 2014). Generally, no parol evidence may be introduced to alter the contents of an authentic act. *See Namas Noor Sdn Bhd v. Williams*, 112 F. Supp. 2d 580, 583 (M.D. La. 2000). But parol evidence may be admitted in the interest of justice to prove error, fraud, or duress. *See* LA. CIV. CODE ANN. art. 1848; *Short v. Mack*, 338 So. 3d 84, 86 (La. App. 4 Cir. 2022). Alternatively, parol evidence may be admitted to prove that the purported act was made in contravention of the law, as where documents are forged:

> Former [Article] 2236 of the 1870 Civil Code (the predecessor to art. 1835) stated that "[t]he authentic act is full proof of the agreement contained in it, against the contracting parties and their heirs or assigns, unless it be declared a forgery." The current version, now [Article] 1835, omitted the reference to forgery, but did not change the law. La. Civ. Code art. 1835 cmt. (a). The comments to [Article] 1835 further explain that the reference was no longer necessary because "[a] forged act is of course not authentic and can have no evidentiary effect." La. Civ. Code art. 1835 cmt. (b); *Namas Noor*, 112 F.Supp.2d 580.

*Succession of Thrasher*, No. 17-377, 2018 WL 1101764, *3 (La. App. 3 Cir. Feb. 28, 2018).

Here, the Quitclaim Deed purports to be in form of an authentic act and, thus, is clothed with a presumption of genuineness. The Quitclaim Deed purports to convey the Property from Lorraine to Burden and contains the signatures of both contracting parties, a notary public, and two witnesses. *See* Joint Ex. 2. But the validity of the Quitclaim Deed is properly before the Court by virtue of the issues raised in the Complaint. *See, e.g.*, *Thrasher*, 2018 WL 1101764 at *3.[8] Count 1 specifically pleads that the Quitclaim Deed be rescinded, terminated, or annulled due to fraud or error. [ECF Doc. 1].[9]

The evidence before the Court strongly rebuts the presumption in favor of the verity of the purportedly authentic act. Of the parties allegedly present at the execution and notarization of the Quitclaim Deed, only Burden and Alfortish are available to testify as to the event. Burden's "misplacement" of the Purchase Contract and Quitclaim Deed—only to find those documents years later and record them in the public record at a time directly coinciding with Lorraine's death—means that Lorraine is unavailable to testify as to the alleged notarization. Pulling two complete strangers aside to serve as witnesses—and failing to verify their identities—conveniently means that they, too, are unavailable to testify as to the events that day.

---

[8] The Court also notes that the Defendants waived any right to object to the admission of parol evidence because none of the Defendants raised any objections during the trial. "Louisiana's parol evidence rule is not substantive law, but a rule of evidence. Therefore inadmissible parol evidence admitted without objection may be considered by the trial court and the appellate court in reaching a decision." *Dugas v. Modular Quarters, Inc.*, 561 So. 2d 192, 196 (La. Ct. App. 1990); *see also In re Succession of Wilson*, No. 2013-164, 2013 WL 5539323, at *4–5 (La. App. 3 Cir. Oct. 9, 2013); *First Nat'l Bank of Ruston v. Mercer*, 448 So. 2d 1369, 1377 (La. Ct. App. 1984); *Wade v. Joffrion*, 387 So.2d 1265 (La. App. 1 Cir. 1980).

[9] The Court notes that the Complaint also pleads that the Quitclaim Deed be rescinded, terminated, or annulled due to elder abuse and lack of capacity. While the evidence supports a finding that Lorraine was frail and infirm, insufficient evidence exists in the record for the Court to make findings on her capacity to enter into the transaction.

But even Burden and Alfortish cannot agree on the most basic detail of the event:  where it happened.  Burden goes to great lengths to describe driving Lorraine across the Mississippi River to Alfortish's house located in a quiet suburban neighborhood so that he could notarize the Quitclaim Deed.  Alfortish testified that he happened to be in Lorraine's neighborhood, stopped by the Property to find two strangers outside the house and a woman inside who he assumed to be a bedridden Lorraine, and witnessed her sign the Quitclaim there.  Neither Burden's nor Alfortish's story is corroborated by any evidence presented to the Court.

Given the inconsistent, conflicting, and self-serving testimony from both Burden and Alfortish, the Court concludes that neither account is credible and that no one witnessed Lorraine execute the Quitclaim Deed.  The Court thus concludes that the Quitclaim Deed was not properly notarized and does not constitute an authentic act.   *See, e.g.*, *Bajewski v. Bajewski*, No. 23-552, 2024 WL 4447831 (La. App. 5 Cir. Oct. 9, 2024); *Arceneaux*, 364 So. 3d 529; *Thrasher*, 2018 WL 1101764; *Villenuve v. Cash*, 231 So. 3d 682 (La. App. 1 Cir. 2017); *Eschete*, 142 So.3d 985; *Meltzer v. Meltzer*, 662 So.2d 58 (La. App. 4 Cir. 1995), *writ denied*, 666 So. 2d 293 (La. 1996).

### 2. *The Quitclaim Deed is a relative nullity and the nullity cannot be cured*.

Like the Purchase Contract, the Quitclaim Deed came to light and was recorded by Burden in the public records after Lorraine's death.  The evidence before the Court reveals that Burden chose to record Lorraine's actions at various times on the day that she purportedly executed the Quitclaim Deed; however, none of the videos shows Lorraine signing the document and she is not here to acknowledge or deny her signature as is required under Louisiana law to give effect to the Quitclaim Deed.  Thus, the Court finds that the Purchase Contract is a relative nullity and that nullity cannot be cured.  *See, e.g., id*. at 294–96; *Turnley v. Turnley*, No. 2020-0849, 2021 WL 6331573 (La. App. 1 Cir. Dec. 30, 2021).

**C. Alternatively, the Transaction Is Absolutely Null Because It Constitutes A Simulation.[10]**

"A simulated sale is one in which the parties do not have genuine intent to transfer or convey property, even though such sale be clothed in concrete form or legal formalities . . . [and thus,] does not transfer [the] property." *Wilson v. Progressive State Bank & Tr. Co.*, 446 So. 2d 867, 869 (La. Ct. App. 1984). "It is a formal contract without existence in fact, and generally embodies a conspiratorial understanding between the parties against third persons in which the parties 'place their property and rights in the name and under the control of others, without any consideration whatever, and without the intention of ownership being actually transferred.'" *Id.* (quoting *Viguerie v. Hall*, 31 So. 1019, 1022 (La. 1902)). A simulation is a sham and, thus, an absolute nullity. *Id.*; *see also Russell v. Culpepper*, 344 So. 2d 1372 (La. 1977); *Succession of Terral*, 312 So. 2d 296 (La. 1975); *Hall v. Allred*, 385 So. 2d 593 (La. App. 3 Cir. 1980); *Bell v. Bell*, 339 So.2d 1333 (La. App. 3 Cir. 1976); *Adams v. Trichel*, 304 So.2d 740 (La. App. 2 Cir.1974).

Louisiana law provides both a codal and a jurisprudentially based presumption of simulation. *See Wilson*, 446 So. 2d at 869. The codal presumption of simulation is found in article 2480 of the Louisiana Civil Code: "When the thing sold remains in the corporeal possession of the seller the sale is presumed to be a simulation, and, where the interest of heirs and creditors of

---

[10]     The Court notes that the Plaintiffs did not assert simulation as a cause of action in the Complaint. *See* [ECF Doc. 1]. But "Louisiana's Code of Civil Procedure uses a system of pleading based upon the narration of factual allegations." *Scott v. Sneed*, 210 So. 3d 872, 874 (La. App. 2 Cir. 2006) (citing *Miller v. Thibeaux*, 159 So.3d 426, 431 (La. 2015)). "[A] final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings and the latter contain no prayer for general and equitable relief." LA. CODE CIV. PROC. ANN. art. 862; *see also Miller*, 159 So.3d at 431–32. The primary assertion in the Complaint is that the Quitclaim Deed is invalid and does not express the true intent of the parties. The Complaint also contains a prayer for general and equitable relief. Thus, the Court finds that the issue of whether the Quitclaim Deed is a simulation is properly before the Court.

the seller is concerned, the parties must show that their contract is not a simulation." LA. CIV. CODE ANN. art. 2480.   "The jurisprudential presumption is applicable where the evidence establishes the existence of facts and circumstances which create a highly reasonable doubt as to the reality of the putative sale." *Wilson*, 446 So. 2d at 869.

Because of their nature, "[s]imulations may ordinarily . . . be established only by indirect or circumstantial evidence." *Dare v. Mynick*, 168 So.2d 845, 849 (La. App. 2 Cir. 1964).   The burden of proof is initially placed on the party attacking a sale as a simulation, but when a presumption of simulation applies, "the burden of proof shifts to the party to the sale to establish that it was authentic and not merely a simulation." *Wilson*, 446 So. 2d at 869.   To rebut that presumption, the party to the purported sale must demonstrate a "good faith[] intent to transfer and the actual payment of consideration." *Fritscher v. Justice*, 472 So. 2d 105, 110 (La. Ct. App. 1985); *see also Wilson*, 446 So. 2d at 869 (listing cases).

Here, the codal presumption of simulation under article 2480 applies because Lorraine retained possession of the Property.   Thus, the burden shifts to Burden to demonstrate a good-faith intent to transfer and actual payment of consideration.   In *Peyton v. Roth*, the only proof offered by the defendant to rebut the presumption of simulation was his own self-serving testimony and that of his wife.   *See* 149 La. 147 (1921).   The Louisiana Supreme Court noted that there was no evidence indicating that the other party to the simulation ever received the consideration for the sale; the opposing party neither deposited the funds into his bank account which he used regularly nor spent or invested the money elsewhere.   *Id.*

Similarly, other than her receipt of $1.00 from Burden, Lorraine never received any other funds from Burden toward the sale price, much less the payment of the "Loan Balance + Fees"

26

required by the Purchase Contract for the sale of the Property. Thus, the Court finds the transaction for sale of the Property to be a simulation and thus an absolute nullity.

## CONCLUSION

Accordingly,

**IT IS ORDERED** that the relief sought in Count 1 of the Complaint is **GRANTED.**

**IT IS FURTHER ORDERED** that the Orleans Parish Clerk of Court is instructed to cancel and remove the Purchase Contract, Quitclaim Deed, and Assignment from the public record.[11]

**IT IS FURTHER ORDERED** that the relief sought in Count 3 of the Complaint is **DENIED**.

A separate judgment on the Complaint consistent with this Memorandum Opinion and Order will be entered contemporaneously and in accordance with Bankruptcy Rules 7054 and 9021.

New Orleans, Louisiana, February 18, 2025.

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE

---

[11]    A copy of the Purchase Contract, the Quitclaim Deed, and the Assignment are attached hereto as **Exhibit 1**.

# Purchase Contract

STATE OF _Louisiana_
COUNTY OF _Orleans_

The Seller(s), whose name is _Lorang~ Robinson_ and address is _3426-28 & 26½ & 28½ S. Liberty Street_ and The Buyer(s), whose name is _Zero Three Four Investment Group LLC_ and address is _2023 Pension St New Orleans, LA. 7015_ hereby agree that the Seller shall sell and the buyer shall buy the following described property upon THE TERMS AND CONDITIONS HEREINAFTER SET FORTH, within this contract.

Legal description of real estate: _34 26½ 34 28½_

Property Address: _3426-3428 S. Liberty ST. New Orleans LA. 70115_

### Upon the Conditions and Terms as Follows:

1. **Full Purchase Price**: $_____ payable in cash, of which the cash deposit in the amount of $_____ shall apply as part. The required earnest money will be held in escrow at _Gulf South_ Title Company. The remaining balance of $_____ will be paid at closing.
2. **Title Insurance:** Buyer is not obligated to purchase the property unless seller can convey good and marketable title.
3. **Survey:** Buyer may obtain a survey of the property. If the property reveals any encroachments or any other matters that adversely affect the property, seller has an additional 30 days to resolve the issues.
4. **Default**: In the event of Seller's default, the Buyer shall be entitled to specific performances. Seller must reimburse Buyer for all cost incurred (title search, survey, appraisal, etc.). In the event of Buyer's default, the Buyer's earnest money deposit is non-refundable. If Seller defaults, all earnest money deposits will be returned to Buyer.
5. **Documentary Stamps**: Both Buyer and Seller will pay for their own closing costs. Seller will be responsible for all back taxes owed.
6. **Buyer may / may not (circle one) assign this contract.**
7. **Conditions for Closing**:
   a. Clear & Marketable Title
   b. Satisfactory survey of the property, free from any encroachments (if purchased by Buyer.)
8. **Closing**: This contract shall close on or before _____ business days following the execution of the agreement. Closing will be held at _Gulf South_ Title Company.
9. **Proration of taxes:** Taxes for the year of the closing shall be prorated as of the date of closing.
10. **Expiration of Offer**: If the offer made in this contract is not accepted and executed within _1_ business days of date indicated below next to Buyer's signature, said offer is withdrawn and shall expire.

Chelsey Richard Napoleon
CLERK OF CIVIL DISTRICT COURT
INST #: 2023-04538 02/10/2023 04:37:01 PM
TYPE: AGREEPS 3 PG(S)
MIN#: 1408937

EXHIBIT
Joint
Ex. 3

AKA *[redacted]* D. R.

**Special Clauses:**

Subject To Inspection, Subject To Partners Approval, Subject To Usufruct, Subject To Appraisal, This property is being purchased Subject To All Existing Mortgage(s), Liens, etc. In place and may be leased with the option To Buy.

**This is intended to be a legally binding contract. If not fully understood, seek the advice of an attorney prior to signing.**

Accepted by all parties on the date(s) signed below.

Seller Signature: _Lorange Robinson_ Date: _12/18/19_

Print Sellers Name: _Lorange Robinson_

Seller Signature: _Lorraine Robinson_ Date: _12/18/19_

Print Sellers Name: _Lorraine Robinson_

Buyer's Signature: _Samantha Burde FOR_ Date: _12/19/2019_

Print Buyers Name: _Zero Three Four Investment Group LLC._

Witness: _____ Date: _____

| Recording requested by: _____ | Space above reserved for use by Recorder's Office |
|---|---|
| When recorded, mail to: | Document prepared by: |
| Name: _____ | Name _____ |
| Address: _____ | Address _____ |
| City/State/Zip: _____ | City/State/Zip _____ |

Property Tax Parcel/Account Number: _____

# Quitclaim Deed

This Quitclaim Deed is made on _December 22, 2019_ , between _KGRANG Robinson_ , Grantor, of _3426, 3428, 3426½ 3428½ S.Liberty St_ _____, City of _New Orleans_ , State of _LA, 70115_

and _Jonathan Burden_ , Grantee, of _3426, 3428, 3426½ 3428½ S.Liberty St_ _____, City of _New Orleans_ , State of _Louisiana 70115_

For valuable consideration, the Grantor hereby quitclaims and transfers all right, title, and interest held by the Grantor in the following described real estate and improvements to the Grantee, and his or her heirs and assigns, to have and hold forever, located at _3426, 3428, 3426½ 3428½ S.Liberty St_ _____, City of _New Orleans_ , State of _Louisiana 70115_ :

Subject to all easements, rights of way, protective covenants, and mineral reservations of record, if any. Taxes for the tax year of _- 2019 +_ shall be prorated between the Grantor and Grantee as of the date of recording of this deed.

Chelsey Richard Napoleon
CLERK OF CIVIL DISTRICT COURT
INST #: 2023-02676  01/24/2023  05:00:49 PM
TYPE: QC 4 PG(S)

CIN#: 722819





EXHIBIT
Joint
Ex. 2

Dated: _December 22, 2019_

_Loranger Robinson_
Signature of Grantor

_LORANGE Robinson_
Name of Grantor

_Jonathan Burden_
SIGNATURE OF GRANTEE

_Jim Myers_
Signature of Witness #1

_Michael Mitchell_
Signature of Witness #2

_JONATHAN BURDEN_
PRINTED NAME OF GRANTEE

_Jim MYERS_
Printed Name of Witness #1

_Michael Mitchell_
Printed Name of Witness #2

State of _LOUISIANA_ County of _ORLEANS_
On _12/22/19_, the Grantor, _Lorange Robinson_ personally came before me and, being duly sworn, did state and prove that he/she is the person described in the above document and that he/she signed the above document in my presence.

_David H. Alfortish_
Notary Signature
_DAVID H. Alfortish, BAR # 02385_
Notary Public,
In and for the County of _Orleans_ State of _Louisiana_
My commission expires: _At death_ Seal

Send all tax statements to Grantee.

Quitclaim Deed Pg.2 (11-12)

ONE CERTAIN PIECE OR PORTION OF GROUND, together with the buildings and improvements thereon, and all of the rights, ways, privileges, servitudes, advantages and appurtenances thereunto belonging or in anywise appertaining, situated in the Sixth District of the City of New Orleans, in Square No. 553, which square is bounded by Liberty, Delachaise and Franklin Streets and Louisiana Avenue, and according to a plan made by Adloe Orr, Civil Engineer, dated March 21, 1926, copy of which is annexed to an act passed before Roger Meunier, Notary Public, dated March 23, 1926. Said lot is designated as Lot 13, and commences a distance of 96 feet from the corner of Liberty Street and Delachaise Street, measuring 32 feet front on Liberty Street, same width in the rear, by a depth of 120 feet between equal and parallel lines.

Improvements thereon bear the Municipal Number 3426-26½-28-28½ South Liberty Street.

1340 Poydras Street, 4th Floor
New Orleans, Louisiana  70112



Land Records Division
Telephone (504) 407-0005

## Chelsey Richard Napoleon

**Clerk of Court and Ex-Officio Recorder**

Parish of Orleans

### DOCUMENT RECORDATION INFORMATION

Instrument Number:  2023-02676

Recording Date:  1/24/2023 05:00:49 PM

Document Type:  QUITCLAIM

Addtl Titles Doc Types:

Conveyance Instrument Number: 722819

Filed by:  504 TITLE LLC
2023 PENISTON ST
NEW ORLEANS LA 70115

## THIS PAGE IS RECORDED AS PART OF YOUR DOCUMENT AND SHOULD BE RETAINED WITH ANY COPIES.

## ASSIGNMENT

This assignment is made and entered into this *19* day of *December*, 20*19* by and between *Zero Three Four Investment Group* with its principal place of business at *2023 Peniston St. Nola 70115* ("Assignor"), and *Jonathan Burden*, (with its principal place of business at/residing at) *2023 Peniston St. Nola 7085* ("Assignee").

**WHEREAS,** Assignor is a party to the purchase and sale contract for real property located at *3426-3428 ½* (address), *S. Liberty* (city), *New Orleans* (state), *LA Dist* (zip code) (the "Property"), more specifically described in the contract which is attached hereto, and incorporated by reference, between *Zero Three Four Investment Group LLC* ("Buyer") and *Lorange Robinson (aka) Lorange Robinson* ("Seller") (the "Contract"); and

**WHEREAS,** Assignor desires to transfer his rights in the Contract to Assignee and Assignee desires to receive such rights under the Contract, and in consideration thereof, Assignee agrees to pay an earnest money deposit in the amount of $▮▮▮▮ upon execution of this Assignment and the balance of $▮▮▮▮ at closing. This deposit shall be non-refundable unless clear title to the Property cannot be delivered to Assignee, in which case the deposit shall be returned within three days after notification of same from the Assignee.

**NOW, THEREFORE,** in consideration of the mutual covenants herein contained and other good and valuable consideration; the receipt and sufficiency of which are hereby acknowledged, Assignor hereby covenants as follows:

1. Assignee hereby accepts said assignment and assumes, covenants, and agrees to carry out and perform all of Assignor's obligations pursuant to the Contract.

2. This Assignment shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.

3. This Assignment shall be governed by and construed in accordance with the laws of the United States and to the extent applicable the laws of the State of *Louisiana* exclusive of the choice of law provisions adopted thereby.

4. This Assignment shall expire ▮▮▮▮ days from the date of the Assignment if the Property is not purchased by that time. The parties agree that this Assignment may be extended upon Assignee's written request for an additional ▮▮▮▮ days with an additional, non-refundable deposit in the amount of $▮▮▮▮ which will be applied to the purchase price.

**IN WITNESS WHEREOF,** Assignor and Assignee have executed this Assignment as of the date first written above.

**AASSIGNOR:** *Zero Three Four Investment Group LLC*

By: *Jonathan Burden*
Its: *Manager*

**ASSIGNEE:** *Jonathan Burden*

By: *Jonathan Burden*
Its:

**EXHIBIT**
*Joint*
*EX.5*

Chelsey Richard Napoleon
CLERK OF CIVIL DISTRICT COURT
INST #: 2023-04539 02/10/2023 04:37:02 PM
TYPE: ASSMT 3 PG(S)

MINN#: 1408930